IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOEL VEGA-ORTIZ, ET AL., | CASE NO.: 19-CV-02056-SCC-GLS |
| *Plaintiffs*, | CLASS ACTION COMPLAINT |
| v. | |
| COOPERATIVA DE SEGUROS MULTIPLES DE PUERTO RICO, ET AL. | |
| *Defendants* | |

**LIBERTY MUTUAL INSURANCE COMPANY'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

COMES NOW the co-defendant, Liberty Mutual Insurance Company ("Liberty"), through the undersigned attorneys, and requests that this Honorable Court enter partial summary judgment in its favor, dismissing with prejudice of the entirety of the action filed against Liberty in the *Third Amended Complaint* (Dkt. 448; "TAC"). A separate Statement of Material Undisputed Facts ("SMUF") will be filed, in compliance with Fed.R.Civ.P. 56 and Local Civil Rule 56(b) and (e).

## I.    INTRODUCTION

This action was filed by four (4) participants of the Real Legacy Assurance Plan ("RLA Plan") for alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA") and for negligence. Specifically, they aver that these violations and negligent acts resulted in the underfunding of the RLA Plan which, in turn, caused a reduction in their accrued benefits thereunder. Liberty was joined as a defendant over four (4) years after the commencement of the litigation and after all the discovery had been completed.[1] For this reason, on July 19, 2024, it filed

---

[1] *See* Dkts. 366, 438, and 448.

a *Motion to Dismiss* the TAC (Dkt. 493) wherein it argued that the TAC was time barred and that neither the federal nor state relation-back doctrines applied. Plaintiffs oppposed on August 16, 2024 (Dkt. 498).

Although Liberty's *Motion to Dismiss* is pending adjudication and, accordingly, it has yet to file an answer to the TAC, Liberty files this motion to comply with the Court-ordered deadline for the filing of dispositive motions (Dkts. 519 and 521)[2], and to preserve its right to request summary judgment concerning, *inter alia*, the applicability of Exclusion 5.21 of the Policy[3].

As will be explained herein, while the insuring agreement of the Fiduciary Liability Coverage of the Policy is triggered as to certain allegations in the TAC, Exclusion 5.21 is clear and unambiguous, and excludes coverage for all loss in connection with a claim that is based upon, arises out of, or is in any way related to an Insured Plan's underfunding, with the sole exception of defense costs. Since none of Plaintiffs' claims would survive but for the alleged underfunding of the RLA Plan and the alleged "failure to fund [the] Insured Plan in accordance with ERISA or the Insured Plan's document," it is inevitable to conclude that Exclusion 5.21 applies. Therefore, in addition to being time barred, the fact that the Policy does not provide coverage for any of the damages and/or requests for relief in the TAC confirms that summary dismissal with prejudice of the entirety of the action filed against Liberty is proper.

## II.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper under Fed. R. Civ. P. 56(a) "if the pleadings, depositions,

---

[2] Liberty requested that the Court postpone the deadline for it to file its motion for summary judgment considering its pending Motion to Dismiss and the fact that it had yet to file an answer to the TAC. However, Liberty's request was denied. *See* Dkts. 522 and 524.

[3] The term Policy will herein have the meaning set forth in the SMUF, ¶ 2.

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *White v. Hewlett Packard Enterprise Company*, 985 F.3d 61, 68 (1st Cir. 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)). The moving party, therefore, bears the two-fold burden of showing that "no genuine issue exists as to any material facts," and that the movant is "entitled to judgment as a matter of law." *Vega-Rodríguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 178 (1st Cir. 1997).

In turn, the opposing party needs to show "that a trial-worthy issue exists" that would warrant the court's denial of the motion for summary judgment. *McCarthy v. Northwest Airlines*, 56 F.3d 313, 315 (1st Cir. 1995). For issues where the opposing party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *Id*.

Summary judgment "permits evaluation of insurance coverage allegations, and dismissal when coverage does not exist." *Hoffman v. Metrohealth, Inc.*, 246 F.Supp.3d 527, 529 (D.P.R. 2017).

## III.    ARGUMENT

### A. Insurance Policy Construction under Puerto Rico Law

Plaintiffs asserted a direct action against Liberty under Puerto Rico Law and, accordingly, said law governs the contruction of the Policy. *See* Dkt. 448, ¶¶ 177-179; P.R. Laws Ann. tit 26,

§§ 2001, 2003. Article 11.250 of the Insurance Code of Puerto Rico ("Insurance Code") states that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made a part of the policy." P.R. Laws Ann. tit. 26, § 1125.

Under Puerto Rico law, insurance contracts are considered contracts of adhesion that must be liberally construed in favor of the insured. *Quiñones Lopez v. Manzano Pozas,* 141 D.P.R. 139, 155 (1996); *Metlife Capital,* 224 F.Supp.2d 374, 382 (D.P.R. 2002). The general rule is that exclusionary language (setting forth circumstances in which the insurance policy does not provide coverage) should be interpreted restrictively in order to comply with the policy's intent of providing coverage to the insured. *Guerrido Garcia v. Univ. Cent. de Bayamón,* 143 D.P.R. 337, 348 (1997); *Marina Aguila v. Den Caribbena, Inc.*, 490 F.Supp.2d 244, 248-49 (D.P.R. 2007). But this general rule does not require courts to interpret a clear and unambiguous clause that favors the insurer in a manner that benefits the insured. *Quiñones Lopez,* 141 D.P.R. at 155; *González v. Coop. Seguros De Vida De P.R.,* 117 D.P.R. 659 (1986); *Metlife Capital,* 224 F.Supp.2d at 382 .

When the terms are clear and unambiguous, they must be applied and enforced as written. *Marina–Águila*, 490 F.Supp.2d at 249; *López & Medina Corp. v. Marsh USA, Inc.*, 667 F.3d 58, 64-65 (1st Cir. 2012). Ambiguity does not exist simply because the parties disagree about the proper interpretation of a policy provision; rather, where the policy's language is susceptible to more than one rational interpretation. *Clark School for Creative Learning, Inc. v. Philadelphia Indem. Ins. Co.*, 734 F.3d 51, 55 (1st Cir. 2013); *Hoffman Garcia v. Metrohealth, Inc.*, 246 F. Supp. 3d 527, 530, (D.P.R. 2017).

4

###### i. *The relevant Policy wording is clear and unambiguous and excludes coverage for all Loss, with the sole exception of Defense Costs.*

The insuring agreement of the Fiduciary Liability Coverage of the Policy states that "[Liberty] shall pay on behalf of the Insured(s) all Loss which they shall become legally obligated to pay as a result of a Claim first made during the Policy Period […] against the Insured(s) for a Fiduciary Wrongful Act which takes place [prior to January 01, 2019]." *See* SUMF, ¶ 4.

Duly elected or appointed directors or officers of an Insured Plan are considered Insureds while acting in their capacity as a Fiduciary or trustee of the Insured Plan or as a person performing Administration of the Insured Plan. *See* SUMF, ¶ 10-11.

Insured Plan is defined as either a welfare benefit plan or "any non-qualified plan not subject to regulation under title I of ERISA or which does not meet the qualification requirements under Section 401(a) of the Internal Revenue Code of 1986, as amended, **but only respect to conduct described in subsection (c) of the definition of Fiduciary Wrongful Ac**t." *See* SUMF, ¶ 12.  (Emphasis ours.)

The RLA Plan was not a welfare benefit plan, as the term is defined by ERISA.[4] The RLA

---

[4] Pursuant to 29 U.S.C.A. § 1002 (1):

> "[t]he terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title **(other than pensions on retirement or death, and insurance to provide such pensions)**."

Plan was a defined benefit plan[5] or pension plan (SUMF, ¶ 14) and because it did not meet the qualification requirements under Section 401(a) of the Internal Revenue Code of 1986 (SUMF, ¶ 15), it is only considered an Insured Plan as respects the conduct described in subsection (c) of the Policy's definition of Fiduciary Wrongful Act.

Pursuant to the referenced subsection (c), Fiduciary Wrongful Act means "any negligent act, error, or omission solely in the Administration of any Insured Plan." *See* SUMF, ¶ 12. In turn, Administration is defined as: "(a) handling records, or giving advice, counsel or interpretation to employees regarding an Insured Plan; or (b) affecting enrollment of employees, and termination, or cancellation of benefits under an Insured Plan." *See* SUMF, ¶ 12.

To the extent that the TAC includes allegations concerning the Administrative Committee's failure to provide plan participants with notices regarding the RLA Plan's alleged underfunding[6], the insuring agreement of the Fiduciary Liability Coverage can be deemed triggered solely with respect to those allegations.

---

(Emphasis ours.)

[5] Pursuant to 29 U.S.C.A. § 1002 (35):

> "[t]he term 'defined benefit plan' means a pension plan other than an individual account plan; except that a pension plan which is not an individual account plan and which provides a benefit derived from employer contributions which is based partly on the balance of the separate account of a participant--
>> (A) for the purposes of section 1052 of this title, shall be treated as an individual account plan, and
>> (B) for the purposes of paragraph (23) of this section and section 1054 of this title, shall be treated as an individual account plan to the extent benefits are based upon the separate account of a participant and as a defined benefit plan with respect to the remaining portion of benefits under the plan."

[6] *See* TAC, ¶¶ 75, 158-162.

Nevertheless, all damages and requests for relief in the TAC are excluded from coverage by the clear and unambiguous language of Exclusion 5.21, which states that:

> "[Liberty] shall not be liable to make any payment of Loss covered under [the Fiduciary Liability Endorsement], **other than Defense Costs**, in connection with any Claim:
>
> 5.21 **based upon, arising from, or in any way related** to the **failure to fund an Insured Plan** in accordance with ERISA or the Insured Plan's document or to collect contributions owed to an Insured Plan."

*See* SUMF, ¶ 13. (Emphasis ours.)

Simply put, the Policy excludes Loss in connection with Claims that are based upon, arise out of, or are in any way related to the underfunding of an Insured Plan.

This exclusion is standard in fiduciary liability policies. The rationale behind it is that it is contrary to public policy to provide insurance coverage for intentional violations of federal law. However, as happens here, most fiduciary liability policies provide coverage for defense costs when such allegations are made. *See*, What else might not be covered by fiduciary liability insurance?, 1 Employee Benefits Handbook § 8B:7.[7]

The phrase "arising out of" or "arising from"[8] does not require a direct and proximate causal relationship but rather an incidental one for the exclusion to apply, which can be established

---

[7] ("*Failure to fund in accordance with ERISA.* Virtually all policies contain this exclusion because it is contrary to public policy to provide insurance coverage for intentional violations of federal law. Of course, defense coverage is provided for allegations of such failures.")

*See*, *also*, International Risk Management Institute, "failure to fund in accordance with ERISA exclusion," https://www.irmi.com/online/glossary/failure-to-fund-in-accordance-with-erisa-exclusion (accessed Jan. 12, 2025.)

[8] *Spirtas Co. v. Fed. Ins. Co.,* 521 F.3d 833, 836 (8th Cir. 2008) ("[I]n the insurance context[,] courts appear to be unanimous in interpreting the phrase 'arising out of' synonymously with the

through a "but for" analysis.[9] The Supreme Court of Puerto Rico, the U.S. Court of Appeals for the First Circuit and the U.S. District Court for Puerto Rico all agree that this phrase should be interpreted broadly to exclude all damages that "originate from, grow out of, flow from, are incidental to, or have a connection with" the excluded conduct. *See, e.g., W.M.M. v. Puerto Rico Christian Sch., Inc.*, 211 D.P.R. 871, 892 (2023); *Reyes López v. Misener Marine Const., Inc.*, 664 F. Supp. 652, 656 (D.P.R. 1987) ("The phrase 'arising out of' is much broader than "caused by" and will ordinarily mean damages "originating from, incident to, or having connection with the [excluded conduct]'"); and *Penn-Am. Ins. Co. v. Lavigne*, 617 F.3d 82, 87 (1st Cir. 2010); ("Under Maine law, as elsewhere, phrases such as 'arising out of,' when used in insurance contracts, do not connote a direct causal nexus.").

In *W.M.M. v. Puerto Rico Christian Sch., Inc.*, 211 D.P.R. 871 (2023), the Supreme Court of Puerto Rico adopted the majority doctrine regarding the expansive interpretation of the phrase

---

term 'arising from.' [(collecting cases)]." The Eight Circuit, in *Spirtas*, also cited with approval the following statement from a California court:

> California courts have consistently given a broad interpretation to the terms "arising out of" or "arising from" in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship.

*Id.*

[9] Couch on Insurance, Construction Provisions; principles of construction -"Arising out of"; "resulting from", § 101:52 (3rd. Ed 2020) ("The phrases are generally considered to mean "flowing from" or "having its origin in." Accordingly, use of these phrases does not require a direct proximate causal connection but instead merely requires some causal relation or connection").

"arising out of," which is consistently interpreted as synonym to "arising from,"[10] and stated that said wording is free from ambiguity. In so doing, the Court stated the following:

> Most state and federal courts, including the United States Court of Appeals for the First Circuit and the Federal District Court for the District of Puerto Rico, have favored a broad interpretation of the phrase "arising out of." The general consensus is that the use of this phraseology does not require a proximate causal connection, but rather **presumes an incidental relationship to the conduct described in the exclusion**. Thus, the courts have interpreted the aforementioned text to be clear, ascribing to it a meaning similar to phrases such as "arising out of," "incidental to," or "having a connection with," among others.

> On the other hand, it has been pointed out that **where the language of an exclusion provides that damages arising from certain situations or events will not be covered, it is inappropriate to provide coverage for these regardless of the theory of liability asserted against an insured**. [(citation omitted.)] Thus, a claim that is clearly excluded from policy coverage cannot be made a covered risk by allegations that conform to the policy language.
> […]

> [W]e adopt the majority doctrine regarding the expansive interpretation of this phrase, about which there is no ambiguity. [...]

> Likewise, we rule that the theory of civil liability is irrelevant to determine whether the exclusion in the insurance contract is applicable, since the determining factor is that all damages, as alleged in the Complaint, arise from [...] [t]he conduct that the insurer intended to exclude [...].

*W.M.M.,* 211 D.P.R. at 892 and 899. (Emphasis ours.)[11]

Pursuant to Exclusion 5.21, the excluded conduct is "failure to fund an Insured Plan in accordance with ERISA or the Insured Plan's document." Consistent with the Supreme Court of Puerto Rico's ruling in *W.M.M.*, *supra*, all damages that arise therefrom, **are incidental to, or have a connection therewith are encompassed within said exclusion**.

---

[10] *See* footnotes 6 and 7, above.

[11] This is an unofficial translation. Liberty will submit a certified translation of the opinion.

9

It should also be noted that, in addition to the "arising out of" wording, Exclusion 5.21 contains the phrase "in any way related to", which has been interpreted to permit an even "loose connection" between the claim and the excluded conduct and requiring only a minimal connection for the exclusion to apply. *See, Twin City Fire Ins. Co. v. Glenn O. Hawbaker, Inc*., 118 F.4th 567, 576 (3d Cir. 2024) ("The language 'based upon, arising from, or in any way related to' is sweeping in scope; the phrase 'arising from' requires only but-for causation (not proximate causation), and the phrase 'in any way related to' seems to permit an even looser connection between a claim and [the excluded conduct]."); *Gregory v. Home Ins. Co*., 876 F.2d 602, 606 (7th Cir. 1989) ("[T]he common understanding of the word 'related' covers a very broad range of connections."); *Twin City Fire Ins. Co. v. Vonachen Servs., Inc*., 2021 WL 4876943, at *16 (C.D. Ill. Oct. 19, 2021) ("The [ ] language 'in any way related to any actual or alleged' is incredibly broad, suggesting only a minimal connection is necessary.") (Citing *R & B Kapital Dev., LLC v. N. Shore Cmty. Bank & Tr. Co.*, 832 N.E.2d 246, 252 (Ill. App. 2005)); *Hanover Ins. Co. v. R.W. Dunteman Co*., 446 F. Supp. 3d 336, 346 (N.D. Ill. 2020) ("The plain language of these [...] provisions is expansive, and these definitions sweep broadly. The Policies' use of the word 'any' in defining Related Claims confirms that only a minimal connection is required.").

All the damages and/or requests for relief in the TAC indisputably relate to, and have a connected with, the alleged underfunding of the RLA Plan that was purportedly caused, in part, by the overconcentration of investment in Puerto Rico bonds. The salient factual allegations in the TAC are the following:

> 44. As a result of these losses and of other unwise investments of Plan funds, financial statements filed by RLA for the year end 2015 show that the Plan was **underfunded** by many millions of dollars.

10

45. The Plan's **underfunding** began even earlier than 2015. By 2014, financial statements showed that the Plan was significantly underfunded, such that it lacked assets sufficient to meet its funding targets under ERISA and to make the payments promised to employees such as Plaintiffs.

[…]

48. Because the Plan was **underfunded**, RLA, as the employer sponsor of the Plan, **was obligated to make additional contributions to amortize this shortfall under ERISA and its regulations**.

49. Upon information and belief, the Plan Administrator Defendants **failed to cause RLA to make the required contributions** to ensure the Plan's solvency.

[…]

52. Indeed, as the amount of the Plan's **underfunding** rapidly increased by millions of dollars up through 2016, **RLA's regular annual contributions to the Plan did not increase**. Although they were well aware that the Plan's funding was in jeopardy, the Plan Administrator Defendants breached their obligations to the Plan to ensure that the employer **made sufficient contributions** to keep the Plan solvent.

[…]

55. The Plan Administrator Defendants knew or should have known that the funding target significantly understated the Plan's liabilities, **and that RLA would need to make larger contributions to ensure the Plan's solvency**. Nonetheless, the Plan Administrator Defendants failed to account for this discrepancy, and thereby breached their obligations to the Plan to ensure that the employer made sufficient contributions from 2014 on to keep the Plan solvent.

56. As a result of the Plan Administrator Defendants' **failure to cause RLA to make the required contributions in light of both the increasing underfunding** and the incorrect interest rate assumption, the Plan remained severely underfunded by many millions of dollars.

[…]

62. Upon information and belief, as a result of the above-referenced **underfunding**, the Plan was frozen effective December 31, 2015, such that no further benefits accrued after that date. Nevertheless, the Plan still lacked sufficient assets to pay the benefits that accrued prior to the freeze, and as of year-end 2017, the Plan was still underfunded by many millions of dollars.

[…]

70. Thus, **as a result of the Plan's underfunding** and ultimate termination, some participants, including some Class members, will only receive a fraction of the

benefits they expected to receive upon retirement, even considering the reduced amount those participants were to receive in light of the Plan being frozen, and despite being fully vested in the Plan. Other participants, including Plaintiffs and other Class members who were terminated or active employees fully vested in their benefits under the Plan but who were not eligible to receive benefits on January 1, 2016, will receive nothing at all.

71. The Plan is a defined benefit plan. Ordinarily, such plans are insured by the Pension Benefit Guaranty Corporation (the "PBGC"), a government agency which ensures that plan beneficiaries do not suffer a loss of benefits if defined benefit plans are terminated without sufficient funding. Defined benefit plans pay annual premiums to the PBGC, and the PBGC will pay the benefits owed under a defined benefit plan up to certain amount **if the plan is terminated without sufficient funds to pay the benefits accrued under it**.

[…]

75. **The underfunding of the Retirement Plan** was not disclosed to the Plaintiffs until April 2019, when RLA's liquidator presented an unsigned letter to the Plaintiffs stating that "luego consultar a los actuaries vinimos en concimiento de que el Plan esta, lo que se conoce en ingles como 'underfunded.'" Or, translated into English, "after consulting the actuaries we came to know that this Plan is, what is known in English, as 'underfunded.'"

76. At any time up and until Plan termination effective December 31, 2018, the Plan Administrator Defendants, Cooperativa, and Banco Popular **could have taken action to cure their breaches of fiduciary duty and ensure the Plan was properly funded,** but none of the Plan Administrator Defendants, or Cooperativa, or Banco Popular acted to cure their breaches of fiduciary duty at any time before the Plan was terminated.

77. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated:

> **All participants or beneficiaries of the Plan who suffered a reduction in accrued benefits under the Plan at the time the Plan was terminated**. Excluded from the Class are any high-level executives at RLA and/or Cooperativa or any employees who had responsibility for or involvement in the administration of the Plan or who are subsequently determined to be fiduciaries of the Plan, including the Individual Defendants.

*See* TAC. (Emphasis ours.)

The above allegations show that none of the stated causes of action would exist "but for" the alleged underfunding of the RLA Plan; that is, the alleged "failure to fund [the] Insured Plan in accordance with ERISA or the Insured Plan's document." Although the insuring agreement of the Fiduciary Liability Coverage of the Policy can be deemed triggered as to certain allegations in the TAC, the wording of Exclusion 5.21 is clear and unambiguous and it excludes coverage for all Loss in connection with a Claim arising from or in any way related to the excluded conduct, with the sole exception of Defense Costs.

Loss is defined by the Policy as "the amount which the Insureds become legally obligated to pay on account of each Claim and for all Claims in the Policy Period […] made against them for [Fiduciary Wrongful Acts] for which coverage applies, including but not limited to, damages, judgments […], settlements and Defense Costs. *See* SUMF, ¶ 12. In turn, Defense Costs are defined as "reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a Claim." *See* SUMF, ¶ 17.

Pursuant to Section 3.1 of the Policy, Liberty "shall have the right **but not the duty** to defend any Claim covered by the [Fiduciary Liability Endorsement]." *See* SUMF, ¶ 8. (Underline ours.) Defense Costs incurred in connection therewith are subject to and shall reduce the $1,000,000.00 Limit of Liability of the Fiduciary Liability Coverage of the Policy. *See* SUMF, ¶¶ 5-6.

Nonetheless, Plaintiff will still try to argue that while Exclusion 5.21 does preclude coverage for claims related to the underfunding of the RLA Plan (which Liberty reiterates permeates the entire TAC), it does not exclude other claims such as those relating to the Puerto Rico bonds losses and the failure of the Administrative Committee to elect PBGC coverage. Plaintiffs will likely cite *Bodewes v. Ulico Casualty Co.*, 336 F. Supp. 2d 263 (W.D.N.Y. 2004) in

support of their position, since, in that case, the court found that the relevant exclusion there did not preclude coverage for fiduciary duty claims.  However, *Bodewes* is inapposite to the instant case for several reasons.

First, the wording of the exclusion in *Bodewes* differs significantly from the wording in Exclusion 5.21 of the Policy. The "Insufficient Contribution" exclusion in *Bodewes* barred coverage for "any **claim or allegation** which directly or indirectly arises out of the… inability of the Trust Fund to pay benefits due to Insufficient Contributions." *Id.* at 271. (Emphasis ours.) The lead-in wording of Exclusion 5.21 of the Policy is different as it excludes "**all Loss,** other than Defense Costs, in connection with any Claim". (Emphasis ours.) Moreover, the exclusion in *Bodewes* did not contain the phrase "in any way related to," which further broadens the scope of Exclusion 5.21 of the Policy and its application.

Second, Puerto Rico law does not compel constructions in favor of the insured when a clause favors the insurer and its meaning and scope is clear and unambiguous, as happens here.[12] The court in *Bodewes* applied a different interpretative standard, construing the exclusionary language "strictly and narrowly" in favor of the insured. *Bodewes*, 336 F. Supp. 2d at 277-279. It focused on whether the breach of fiduciary duty claims in the underlying action **fell entirely within the exclusion** and concluded that the insurer there failed to demonstrate that the allegations placed the insured's breach of fiduciary duty claims "solely and entirely" within the exclusion. *Id*., at 278. However, the standard under Puerto Rico law is that clear and unambiguous exclusions, like the one at issue here, are enforced as written. *Bodewes* is, therefore, distinguishable and inapplicable.

---

[12] See *W.M.M. v. Puerto Rico Christian Sch., Inc*., 211 DPR at 886, 899-900; *AJC Logistics, LLC v. Econ. Int'l Servs., Inc*., 967 F. Supp. 2d 546, 558 (D.P.R. 2013); *AJC Int'l, Inc. v. Triple-S Propiedad*, 790 F.3d 1 (1st Cir. 2015) ("this general rule does not require courts to interpret a clear and unambiguous clause that favors the insurer in a manner that benefits the insured.").

## IV.    CONCLUSION

In sum, Liberty reiterates all the arguments set forth in its *Motion to Dismiss* (Dkt. 493) and its defense that the TAC is time barred and that neither the federal nor state relation-back doctrines applies. Nevertheless, in addition to being time barred, the fact that the Policy does not provide coverage for any of the damages and/or requests for relief in the TAC confirms that summary dismissal with prejudice of the entirety of the action filed against Liberty is proper.

Summary judgment "permits evaluation of insurance coverage allegations, and dismissal when coverage does not exist." *Hoffman v. Metrohealth, Inc.*, 246 F.Supp. at pg. 529. Liberty has shown that while the insuring agreement of the Fiduciary Liability Coverage of the Policy is triggered as to certain allegations in the TAC, the wording of Exclusion 5.21 is clear and unambiguous and excludes coverage for all Loss in connection with a Claim arising from or in any way related to the alleged "failure to fund [the] Insured Plan in accordance with ERISA or the Insured Plan's document." Coverage is only afforded for Defense Costs. Accordingly, the TAC should be dismissed with prejudice as to Liberty.

WHEREFORE, Liberty respectfully requests that this Honorable Court grants this motion and enters partial summary judgment, dismissing with prejudice the entirety of the action filed against it in the *Third Amended Complaint* (Dkt. 448), together with such further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED,

In San Juan, Puerto Rico, this 13th day of January of 2025.

> SALDAÑA, CARVAJAL & VÉLEZ-RIVÉ, P.S.C.
> 166 Avenida De La Constitución
> San Juan, Puerto Rico 00901
> Tel.: (787) 289-9250

Fax:  (787) 289-9253

s/ *Xaymara Colón González*
Xaymara Colón-González, Esq.
USDC-PR No.: 231405
E-mail: xcolon@scvrlaw.com
s/ *Manuel E. Mazo Nido*
Manuel E. Mazo Nido. Esq.
USDC-PR No.: 306607
E-mail: mmazo@scvrlaw.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel who have filed appearances in this case.

SALDAÑA, CARVAJAL & VÉLEZ-RIVÉ, P.S.C.
166 Avenida De La Constitución
San Juan, Puerto Rico 00901
Tel.: (787) 289-9250
Fax:  (787) 289-9253

s/ *Xaymara Colón González*
Xaymara Colón-González, Esq.
USDC-PR No.: 231405
E-mail: xcolon@scvrlaw.com